Joan Marie **WEICHHAND**, Administratrix of the Estate of Ramona Bradford, Deceased and Paul J. Theissen, Administrator of the Estate of Jasper N. Bradford, II, Deceased, Appellants,

v.

John **GARLINGER**, Appellee.

Court of Appeals of Kentucky.

Nov. 13, 1969.

Ralph P. Rich, Covington, Bertelsman & Bertelsman, Newport, O'Hara, Ruberg & Cetrulo, Covington, for appellants.

Wayne Bridges of Bridges & Nelson, Covington, Frank Trusty II; Hughes, Clark & Burke, Covington, for appellee.

CULLEN, Commissioner.

The personal representatives of Jasper and Ramona Bradford, deceased, are appealing from a judgment awarding $100,000 damages to John Garlinger for personal injuries sustained by him in a collision between his car and the Bradfords' car. The personal representatives brought the suit initially, seeking damages for wrongful death, and Garlinger counterclaimed. The jury found that the accident was caused solely by the negligence of Jasper Bradford, driver of the Bradford car, wherefore the verdict denied any recovery to the plaintiffs and awarded the defendant recovery on his counterclaim. The judgment followed the verdict.

■ We shall consider first the contention of the appellants that they were entitled to a directed verdict on their claim and on Garlinger's counterclaim, on the ground that as a matter of law they were not negligent and he was negligent. Related to this is the contention that the court erred in giving a sudden-emergency instruction for Garlinger.

The accident occurred around 5:15 p. m. on a day in November on a two-lane, blacktopped country road which runs east and west. The road is straight in the area where the accident occurred and it slopes downward from west to east. Garlinger was traveling eastwardly in a Chevrolet stationwagon. The Bradfords were headed west in a black Chevrolet sedan. The two cars collided substantially head-on. Although there was some dispute on the trial as to which car was on the wrong side of the road at the moment of collision, the evidence established conclusively, we think, that the collision took place in the Bradfords' lane and that the Garlinger car was on the wrong side of the road. The Bradfords were killed. This left as eyewitnesses to the collision only Garlinger and one Anna Mae Chumley, whose car, headed west, had been passed by the Bradford car shortly before the collision. (The key question in this case is: How shortly?) Another witness, one Milton Henderson, who was in his yard some 200 or 300 feet from the scene of the accident and who ran to the scene after hearing the sound of the impact, gave some testimony from which inferences could be drawn as to the movement of the Garlinger car immediately preceding the impact.

Garlinger's testimony was that he was driving about 35 miles per hour. He saw a white car approaching from the opposite direction and then observed a black car pull out to pass the white car, coming over a rise. At one point in his testimony he said that the white car was about 400 feet from him when the black car pulled out to pass; at another point he said the black car was only 90 to 100 feet from him when he saw it pull out to pass. Similarly, at one point in his testimony he said that he could not estimate the speed of the black car, although it was "fast," while at another point he said that his "guess" would be that the speed was 75 or 80 miles an hour. Garlinger testified that when he saw the black car approaching on his side of the road, in its passing movement, he "tried to get out of the way by hitting my brakes and getting to the right," and that is the last he could remember.

Mrs. Chumley's testimony (which was read from a pretrial deposition, she not being present at the trial) was that she was proceeding westwardly, in a light-colored car, about 30 or 35 miles per hour and:

"* * * So coming on, a black Chevrolet passed me. As he got past me, he went to throwing his brake lights on, they were coming on, flashing on and off, on and off. I put my foot on the brake and kept slowing down. Well, then, crash, I don't know. * * * This car that passed me, and when the crash happened, a green car came up, bounced up. That's the first I even seen that car the whole time after the car passed me. I didn't see him coming this way or toward me or anything. Just when the crash happened, that station-wagon bounced up and the other car, the back end went up."

She said that from the point where the black car passed her to the point where the collision took place was around the length of a city block, and that she stopped her car "a long time before the collision. I run the rest of the way." She stated that the black car got back on its right side of the road before the collision. When asked how fast the black car was going when it passed her she said she could not tell, and when asked if it was going at a "pretty fast rate of speed" her answer was "I don't know." She said that she was the first person to arrive at the scene and that no one else arrived for ten minutes.

The witness Henderson testified that upon hearing the sound of the collision he ran to the scene from his yard, some 200 or 300 feet, and when he arrived "there was a car just pulled over the rise ahead of the accident and a lady got out. I noticed that when I went down over the bank and I got to the death car before she did, I would say maybe a few steps." The woman's car was parked "up the road I would say 75 feet or so." He said he observed marks on Garlinger's right side of the road; "there was a ditch where it looked like a car skidded, marks in the bank where I don't know whether the back end was thrown off and tore up the turf but there was a skid mark I would say six, eight feet in the back of his car on the right side of the road and the gravel had been torn up like a car had been in a skid." When asked whether the skid marks led to the tires of the Garlinger car he replied: "Yes, I assumed that's what made it. I'm no expert."

Police officers who investigated the accident said that there were skid marks extending back 50 feet from the Bradford car, entirely in the Bradfords' proper traffic lane.

The foregoing is all of the evidence that contains any support for Garlinger's theory of the case, which is that the circumstances under which the Bradford car passed the Chumley car were such that the passing constituted negligence; that Garlinger was confronted with an emergency created by Bradford's negligence; and that he could not be charged with negligence if his car got on the wrong side of the road in his efforts to escape from the emergency situation.

Our first problem is to determine whether the evidence warranted a finding of Bradford's negligence. Of course in making this determination we consider the evidence in the light most favorable to Garlinger. It is our conclusion that the evidence did warrant the finding that Bradford's passing movement violated KRS 189.340(3), which provides:

"(3) No vehicle shall be driven to the left side of the center of the roadway in overtaking and passing another vehicle proceeding in the same direction unless the left side is clearly visible and free of oncoming traffic for a sufficient distance ahead to permit overtaking and passing to be completely made without interfering with the safe operation of any vehicle approaching from the opposite direction or any vehicle overtaken.

In every event the overtaking vehicle must return to the right-hand side of the roadway before coming within one hundred feet of any vehicle approaching from the opposite direction."

Garlinger's testimony that the Bradford car was within 90 to 100 feet of him when it "pulled out to pass" perhaps is incredible, since it seems impossible that the Bradford car could have completed its passing movement, and then returned to its side of the road in time to make 50 feet of straight skid marks on its side, before the collision, if it was only 90 or 100 feet from Garlinger's car when it *began* the passing movement. Furthermore, if it had been that close, it seems impossible for the Chumley car not to have ended up in the collision also. However, as stated in Kentucky Transport Corporation v. Woodward, Ky., 265 S.W.2d 480, an estimate of distance, representing nothing more than a fleeting impression received at the very moment of a violent collision, cannot be given conclusive effect. We think that Garlinger's varying estimates, ranging from 400 feet down to 90 or 100 feet, can be accepted as basis for a finding that the Bradford car commenced to pass when the Garlinger was within a distance of 400 feet or less. If Bradford expected to pass the Chumley car, which was going 30 or 35 miles per hour, and return to his own side *without colliding with the Garlinger car in* its lane, obviously it was necessary for Bradford to travel "fast" (as Garlinger said he was). If Bradford was going only 55 m. p. h., and Garlinger 35 m. p. h., the two vehicles were approaching each other at approximately 135 feet per second, which meant that they would meet in approximately three seconds. We think reasonable minds could believe that this was *not enough time and distance to permit the* "overtaking and passing to be completely made without interfering with the safe operation" of Garlinger's car (KRS 189.340).

The fact that the Bradford car was able, after passing Mrs. Chumley, to get back on its own side of the road and straighten out, at least 50 feet before the place of collision, does not foreclose the conclusion that the overtaking and passing were not such as to interfere with the safe operation of Garlinger's car. The fact could mean only that if Garlinger had proceeded in his own traffic lane, Bradford would have escaped hitting him by a margin of perhaps a second or less—hardly a fair margin of safety.

Some support for a belief that Bradford's overtaking and passing operation was executed when the Garlinger car was dangerously close is to be found in Mrs. Chumley's testimony that "As he got past me, he went to throwing his brake lights on, they were coming on, flashing on and off, on and off." It is true that Mrs. Chumley said the collision took place so far ahead of her that she walked the distance of a city block's length to reach the crashed cars after stopping her car, which would indicate that the Garlinger car was not close when the Bradford car passed her car. But this testimony was not entitled to full credence in view of the testimony of Henderson that the woman he saw (whom the jury could believe was Mrs. Chumley) had stopped her car only 75 feet from the point of collision.

If, as we have concluded, the evidence warranted a finding that Bradford executed his overtaking and passing movement when Garlinger was so closely approaching that the safe operation of Garlinger's car was interfered with, then the evidence necessarily warranted a finding that Garlinger, the safe operation of whose car was so interfered with, was thereby confronted with an emergency. And if, upon his applying his brakes in an effort to escape the emergency situation, his car skidded into the path of the other car or went out of control, the jury would be warranted in finding him not negligent. See Annotation, 47 A.L.R.2d, 6, at pp. 92 to 94.

So we conclude that the questions of Bradford's negligence and Garlinger's con-

tributary negligence were for the jury, and that the sudden emergency instruction was proper.

Several other questions remain for consideration.

■ Growing out of the collision, a criminal charge of negligent homicide was placed against Garlinger. He was tried on that charge before this civil case was tried. He made no defense, was found guilty, and received a one-year suspended sentence. The appellants contend that this conviction should have been treated in the civil case as *conclusive* evidence of Garlinger's culpable negligence. The appellants concede that our rule and the rule in the great majority of other jurisdictions is to the contrary. See Harlow v. Dick, Ky., 245 S.W. 2d 616; Commonwealth Dept. of Public Safety v. Glasscock, Ky., 415 S.W.2d 106; 46 Am.Jur.2d, Judgments, secs. 615 to 619, pp. 772 to 779. However, they argue that the holding in a few jurisdictions, that the criminal conviction is conclusive, is better reasoned. It is sufficient to say that we are not so persuaded.

■ On the trial of the instant case evidence of the criminal conviction was admitted, over Garlinger's objections. He made no request, at the time of admission, for any *admonition*. However, at the close of the trial he requested an *instruction* that the criminal conviction could be considered as evidence of negligence but was not conclusive. The trial court refused to give such an *instruction* but did give an *admonition* to that effect. The appellants maintain that it was error to give the admonition for two reasons; first, because an admonition should be given at the time the evidence in question is received, and unless requested at that time the right to the admonition is waived; second, because an admonition as to the *weight* or *effect* of evidence, as distinguished from its *purpose*, is never proper. We agree that the giving of the admonition was error, for both reasons. Supporting the first reason are Mill-

er v. Noel, 193 Ky. 659, 237 S.W. 373; Sally v. Brown, 220 Ky. 576, 295 S.W. 890; and Hall v. Childress, Ky., 420 S.W. 2d 398. Supporting the second reason are 53 Am.Jur., Trial, sec. 593, pp. 468, 469; and Brown v. Commonwealth, 199 Ky. 831, 251 S.W. 994. It is our opinion, however, that the giving of the admonition was not prejudicial. If the jurors had a modicum of intelligence they must have realized, even without the admonition, that the criminal conviction was not conclusive of the question of Garlinger's culpable negligence, because otherwise the court would not be asking the jury to decide that question. We do not believe that the giving of the admonition could reasonably have had the effect of inducing the jury to *discredit* the conviction. We think any possibility of prejudice in favor of Garlinger, as relates to the weight to be given the conviction, was balanced out by the possibility of prejudice against him from the fact that the admonition *reminded* the jury of the conviction and gave special emphasis to it.

■ The appellants contend that the evidence as to Garlinger's having imbibed alcoholic beverages before the collision was so strong as to make him negligent as a matter of law. The evidence consisted of the testimony of two police officers that when they observed Garlinger at the scene of the accident there was a strong odor of alcohol emanating from his person. Controverting this there was the testimony of the witness Henderson, who helped lift Garlinger into the ambulance, that he did not smell any alcohol, and the testimony of the doctor in the emergency room at the hospital that he did not remember any smell of alcohol on Garlinger's breath; also there was Garlinger's own testimony that he had drunk only one glass of beer. Obviously the evidence of intoxication was not conclusive in these circumstances.

■ The trial court, in its instructions, listed various duties of Bradford and Garlinger. In the list, as to each of them, was the duty to drive at a reasonable rate of

speed. The appellants argue that instructing on this duty, as to Bradford, was error. We find no merit in this argument because (1) there was evidence of excessive speed on Bradford's part, which could have been a material factor in creating the *emergency* situation which caused Garlinger to apply his brakes and lose control of his car; (2) the appellants *offered* an instruction including *Garlinger's* duty as to speed, which was less warranted than one as to Bradford's duty; and (3) the instruction even if erroneous was not calculated to be predjudicial since speed was merely given mention in a list of standard duties of both drivers. (On the last point see McKinny v. Bailey, Ky., 316 S.W.2d 370.)

Finally, the appellants contend that the trial court erred in overruling their motion for a new trial based on newly discovered evidence. The alleged newly discovered evidence consisted of a little more positive statement from Mrs. Chumley than she had given in her pre-trial deposition (which was read at the trial because she was not present) to the effect that Bradford had completed passing her car and had returned to his proper side of the road a considerable time and distance before the collision; also the motion asserted that similar testimony would be forthcoming from several unnamed alleged passengers in Mrs. Chumley's car (whose existence is claimed for the first time in the motion). We think the trial court exercised a proper discretion in overruling the motion, because, first, there was an insufficient showing of diligence in trying to secure Mrs. Chumley's presence at the trial (the appellants had not even asked for a subpoena for her); and, second, it is by no means probable that the new evidence would change the result of the case. Mrs. Chumley's credibility left much to be desired and was not such as would be calculated to give her testimony strong weight with a jury. The alleged newly found but unnamed passengers would fall much in the same category, since all of the evidence on the trial negatives any idea of their existence.

The judgment is affirmed.

HILL, C. J., and PALMORE, REED and STEINFELD, JJ., concur.

NEIKIRK, J., dissents.

MILLIKEN, J., not sitting.